JDM 2.7.24

ASJZ/SLT/TH: USAO2024R00077

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** RDB 24 cr 34 |
| | * | |
| **v.** | * | **(Conspiracy, 18 U.S.C. § 371;** |
| | * | **Operating Unlicensed Money** |
| **RODNEY BURTON, a/k/a** | * | **Transmitting Business, 18 U.S.C.** |
| **"BITCOIN RODNEY,"** | * | **§ 1960; Forfeiture, 18 U.S.C.** |
| | * | **§ 982(a)(1) and (b)(1), 21 U.S.C.** |
| **Defendant.** | * | **§ 853(p))** |
| | * | |
| | * | |

\*\*\*\*\*\*

### INDICTMENT

### COUNT ONE
### (Conspiracy to Operate Unlicensed Money Transmitting Business)

The Grand Jury for the District of Maryland charges that:

At times material to this Indictment:

### Relevant Entities, Individuals, Terms

1.    Defendant, **RODNEY BURTON** ("**BURTON**"), a/k/a "Bitcoin Rodney," was a resident of Miami-Dade County, Florida.

2.    Brenda Chunga ("CHUNGA"), a/k/a "Bitcoin Beautee," was a resident of Anne Arundel County, Maryland.

3.    "Cryptocurrency" was a digital asset in which transactions were verified and records were maintained by a decentralized system using cryptography, rather than a centralized authority such as a bank or government.  Like traditional fiat currency, there were multiple types of cryptocurrencies, such as Bitcoin (BTC) and Tether (USDT).

USDC- BALTIMORE
'24 FEB 7 PM 7:25

4.      A blockchain or distributed ledger was a database spread across a network of computers that recorded transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." These systems typically relied on cryptographic techniques to secure recording of transactions.

5.      Decentralized finance, a/k/a "DeFi," generally referred to various financial applications, or technology, in blockchain and cryptocurrency that sought to remove centralized institutions, third parties, and other intermediaries from financial transactions.

6.      Individuals and entities seeking to operate a money transmitting service had to register their business with the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury. FinCEN regulations governed money transmitting business registration requirements.

7.      Title 31 U.S.C. § 5330, and the regulations promulgated thereunder, set forth money transmitting business registration requirements under federal law.    Transactions denominated in whole or in part in cryptocurrencies were subject to these requirements.

8.      **BURTON** and CHUNGA were promoters of HyperFund, a/k/a "HyperTech," a/k/a "HyperCapital," a/k/a "HyperVerse," a/k/a "HyperNation" (collectively, "HyperFund").

9.      HyperFund was an unincorporated organization established in approximately June 2020. It operated a purportedly legitimate DeFi cryptocurrency investment platform and touted its investment program to the public through social media and other means. HyperFund obtained over $1 billion from victim-investors worldwide.

10.     A network of HyperFund promoters, in the District of Maryland and elsewhere, made fraudulent promotional presentations to investors and potential investors.    In those presentations, promoters touted HyperFund's investment programs, including the purported

returns that prospective investors could earn from investing with HyperFund. Potential investors were told that they could purchase "memberships" in the "world's most sustainable passive rewards program."

11.     Among other representations, HyperFund promoters falsely claimed that investors who purchased "memberships" would receive between 0.5% to 1% daily in passive rewards until HyperFund doubled or tripled the investors' initial investment.

12.     To convince investors that HyperFund could make these daily payments of passive rewards, HyperFund promoters claimed that payments would be disbursed in part from revenues generated from large-scale crypto mining operations. In fact, HyperFund did not have any such operations.

13.     HyperFund rewards took the form of "HU," a/k/a "hyper units," a/k/a "HyperUSD," a trading currency internal to HyperFund. HyperFund claimed that HU had parity with the U.S. dollar. HyperFund's investors typically acquired HU by converting fiat currency to the cryptocurrency Tether via a digital exchange, transferring that Tether to HyperFund's platform, and finally exchanging that Tether for HU. An image from HyperFund's marketing material appears below:



GLOBAL BLOCKCHAIN COMMUNITY
2020

## 1. **WHAT** IS HU?

HU (HyperUSD) is the equivalent to USD and has a 1:1 value to the US Dollar. It is an internal value indicator that is used within the ecosystem in order to protect the value of your daily rewards.

Copyright ©2020 HyperTech™. All Rights Reserved.

14.     Initially, investors who sought to withdraw their funds were able to convert HU to Tether through HyperFund's platform and convert that cryptocurrency to fiat currency. However, beginning in at least July 2021 HyperFund began blocking investors' ability to withdraw HU and convert it to cryptocurrency (which could in turn be converted to fiat currency). Although HyperFund investors could not convert their HU to cryptocurrency after this point, they could transfer HU to other investors' HyperFund accounts.

15.     HyperFund conducted its business principally by means of websites, including http://thehyperfund.online, https://thehyperfund.com/, https://h5.thehyperverse.net/, and https://www.thehyperverse.net/ (collectively, the "HyperFund Websites"). The HyperFund Websites were accessible worldwide to the public, including to prospective investors residing within the District of Maryland.

### THE CHARGE

16.     From at least in or about June 2020 through in or about January 2022, in the District of Maryland and elsewhere, **RODNEY BURTON**, and others known and unknown, unlawfully, willfully and knowingly, combined, conspired, confederated, and agreed together and with each

other to commit an offense against the United States, to wit, to violate Section 1960 of Title 18, United States Code.

## Object of the Conspiracy

17.     It was a goal of the conspiracy that **BURTON** and his co-conspirators, including CHUNGA, sought to provide unlicensed money transmitting services, for the purpose of promoting HyperFund, obtaining, converting, and using investors' funds, and enhancing their own personal wealth.

## Manner and Means of the Conspiracy

18.     It was part of the conspiracy that **BURTON** knowingly conducted, controlled, managed, supervised, directed, and owned Burton Holdings Co. LLC, RBJ Consulting, Inc., and The Bit Group, LLC (the "Burton Entities") which purportedly offered consulting services and were in fact unlicensed money transmitting businesses.  **BURTON** never registered any of the Burton Entities as a money transmitting business.

19.     It was further part of the conspiracy that **BURTON** opened bank accounts for the Burton Entities, and directed HyperFund investors to transfer U.S. dollars via wire or check to **BURTON**'s personal bank account and/or bank accounts for the Burton Entities.

20.     It was further part of the conspiracy that, in exchange for payments from HyperFund investors and a three percent fee, **BURTON** transferred a purportedly equivalent amount of Tether cryptocurrency and HU from his HyperFund account to investors' HyperFund accounts.

21.     It was further part of the conspiracy that **BURTON** informed CHUNGA to instruct investors to send U.S. dollars via wire or check with the memo line "Consultation/Training," to avoid drawing scrutiny from banks, even though no consulting services were rendered.

22.     In furtherance of the conspiracy to operate an unlicensed money transmitting business, that from in or about June 2020 through in or about January 2022, **BURTON** and his co-conspirators received more than 500 payments, totaling more than $7,000,000, from individuals who wished to invest in HyperFund, including investors in the District of Maryland.

### Overt Acts

23.     In furtherance of the conspiracy and to accomplish its object, on or about the following dates, **BURTON**, CHUNGA, and others committed the following overt acts, among others, in the District of Maryland and elsewhere:

24.     On or about March 2, 2021, **BURTON** received a $40,000 wire transfer to Burton Holdings Co. LLC from Victim-Investor 1, a then-resident of Montgomery Village, Maryland. The memo line stated, "Membership Registration."

25.     On or about March 17, 2021, **BURTON** received an additional $10,000 wire transfer to The Bit Group, LLC from Victim-Investor 1.

26.     On or about April 9, 2021, **BURTON** received $20,500 to Burton Holdings Co. LLC in the form of a cashier's check from Victim-Investor 1's wife, Victim-Investor 2. The memo line stated, "Consulting Fund hypercyn account." Victim-Investor 2 was also then a resident of Montgomery Village, Maryland.

27.     In or about March and April 2021, **BURTON** transferred a purportedly equivalent amount of Tether from his own HyperFund account to Victim-Investor 1 and Victim-Investor 2's HyperFund account.

28.     On or about March 31, 2021, **BURTON** $10,000 to Burton Holdings Co. LLC in the form of a cashier's check from Victim-Investor 3. The memo line stated "Consulting."

29.     On or about April 6, 2021, **BURTON** received a communication stating that Victim-Investor 3 was asking about the "timeframe on his funding."  Several days later, on April 14, 2021, **BURTON** sent a communication stating, "Yes I got that one [Victim-Investor 3]."

30.     On or about June 26, 2021, **BURTON** provided CHUNGA with wire information for Burton Holdings Co. LLC, which could be used in facilitating a money transfer.  **BURTON** stated that the memo line should say "CONSULTING."

31.     On or about August 10, 2021, **BURTON** received a communication from CHUNGA asking **BURTON** to transfer HU to CHUNGA because she had "one guy for 50k and 3 people for 30k."

32.     On or about August 12, 2021, **BURTON** received a communication from CHUNGA asking **BURTON** to confirm if "30k hit your account today for [Victim-Investor 4]."

33.     On or about August 13, 2021, **BURTON** received a communication from CHUNGA that read, "I owed you 140,000 HU.  Wire for 51k hit.  30k hit, 31k hit.  I have a cashiers check made out to you for 20k that I will deposit and send you a picture of the receipt and this 16,583 wire that was sent this morning.  So that's a total of 148,100.  So all that I would need from you in HU is 8,100."

34.     From in or about June 2020 through January 2022, **BURTON** received more than 500 wire transfers or cashier's checks, totaling more than $7 million from individuals who wished to invest in HyperFund, including investors in the District of Maryland.

35.     In or around August 2021, **BURTON** and CHUNGA transferred Tether and HU between their own HyperFund accounts to facilitate crediting payments of U.S. dollars to investors' HyperFund accounts.

18 U.S.C. § 371.

## COUNT TWO
### (Operating Unlicensed Money Transmitting Business)

36.     The Grand Jury realleges paragraphs 1 through 15 and 18 through 35 of this

Indictment here.

37.     From in or about June 2020 until at least in or about January 2022, in the District

of Maryland and elsewhere, the defendant herein,

**RODNEY BURTON**
a/k/a "Bitcoin Rodney"

did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed

money transmitting business, which affected interstate and foreign commerce in any manner and

degree, and (1) which was operated without an appropriate money transmitting license where such

operation was punishable as a misdemeanor or felony under State law, and (2) failed to comply

with the money transmitting business registration requirements under section 5330 of Title 31,

United States Code, and regulations prescribed under such section.


18 U.S.C. § 1960.

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 982(a)(1) and (b)(1) and 21 U.S.C. § 853(p), in the event of the defendant's conviction under Counts One and Two of this Indictment.

### Unlicensed Money Transmitting Business Forfeiture

2.      Upon conviction of the offenses alleged in Count One or Two of this Indictment the defendant,

**RODNEY BURTON,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense(s), or any property traceable to such property.

### Property Subject to Forfeiture

3.      The property to be forfeited includes but is not limited to: a forfeiture money judgment in the amount of approximately $7,000,000.

### Substitute Assets

4.      If, as a result of any act or omission of the defendant, any of the property described above as being subject to forfeiture:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third person;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or,

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C § 982(b)(1).

18 U.S.C. § 982(a)(1) and (b)(1)
21 U.S.C. § 853(p)

Date:

_Erek Barron / SLT_
Erek L. Barron
United States Attorney

_Glenn Leon / SLT_
Glenn S. Leon
Chief, Fraud Section

A TRUE BILL:

**SIGNATURE REDACTED**
FOREPERSON

2/7/24
Date