hmg 5.29.26

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

---

| | | | |
|---|---|---|---|
| *Christina A. Hoffman*<br>*Assistant United States Attorney*<br>*Christina.Hoffman@usdoj.gov* | *Mailing Address:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | *Office Location:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | DIRECT: *410-209-4871*<br>MAIN: *410-209-4800*<br>FAX: *410-962-4951* |

May 29, 2026

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

·3:57 pm, Jun 15 2026
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ R.C. _____ Deputy

Shari Silver Derrow, Esq.
Assistant Federal Public Defender
100 S. Charles St., Tower II, 9th Floor
Baltimore, MD 21201

Re:    *United States v. Rodney Burton,*
        Crim No. RDB-24-034

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Rodney Burton (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office" or "the Government"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **June 19, 2026**, it will be deemed withdrawn. The terms of the Agreement are as follows:

Offense of Conviction

1.      The Defendant agrees to plead guilty to Count One of the Indictment, charging the Defendant with conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

Elements of the Offense

2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which the Government would prove if the case went to trial, are as follows:

That on or about the time alleged in the Indictment, in the District of Maryland:

(1) The Defendant and one or more persons entered into the unlawful agreement charged in the Indictment;
(2) The Defendant knowingly and willfully became a member of the conspiracy;
(3) One of the members of the conspiracy knowingly committed at least one of the overt acts charged in the Indictment; and
(4) The overt act was committed to further some objective of the conspiracy.

Penalties

3.      The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 371 | 5 years | 3 years | Greater of $250,000 or twice the pecuniary gain or loss, pursuant to 18 U.S.C. § 3571 (d) | $100 |

        a.      Prison:  If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

        b.      Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

        c.      Restitution:  The Court must order the Defendant to pay restitution if it is applicable pursuant to 18 U.S.C. §§ 3663A and 3664.

        d.      Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

        e.      Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

        f.      Collection of Debts:  If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes the Government to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by the Government.

2

## Waiver of Rights

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, the Government, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further

3

trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

      h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

      5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

      6.     The Government and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

      a.     The Government and the Defendant further agree that the applicable base offense level is **6** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2S1.3(a)(2).

      b.     The Government and the Defendant further agree that, pursuant to U.S.S.G. §§ 2S1.3(a)(2) and 2B1.1(b)(1)(J), **18** levels should be added because the value of the funds transferred to the Defendant is over $3,500,000, but less than $9,500,000.

      c.     The Defendant reserves the right to argue that the offense level should be reduced, pursuant to U.S.S.G. § 2S1.3(b)(3). If applicable, U.S.S.G. § 2S1.3(b)(3), would reduce the offense level to 6. The Government reserves the right to oppose any reduction in the offense level based on U.S.S.G. § 2S1.3(b)(3).

      d.     Accordingly, the Government contends that the adjusted offense level is **24**, but the Defendant contends that the adjusted offense level is **6**.

      e.     The Government does not oppose a **2-level** reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent

4

prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. If the adjusted offense level is 24, the Government agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1-level** decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. The Government may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, the Government, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, the Government agrees to recommend a sentence no higher than the low end of the applicable advisory guidelines range based on a final offense level of 21. The Government also reserves the right to advocate for a reasonable period of supervised release and/or any fine, considering any appropriate factors under 18 U.S.C. § 3553(a). The Government and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that the Government or the Defendant deem relevant to sentencing.

## Waiver of Appeal

10. In exchange for the concessions made by the Government and the Defendant in this Agreement, the Government and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b.      The Defendant and the Government knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from the Government or any investigating agency.

## Forfeiture

11.      The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses, which the parties stipulate is at least $7,851,711.00 in U.S. currency.

12.      Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to a money judgement in the amount of at least $7,851,711.00 in U.S. currency to the United States, which the Defendant agrees represents proceeds derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities.

13.      The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14.      The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15.      The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil

6

or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Defendant's Conduct Prior to Sentencing and Breach

16.    Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, the Government, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

17.    If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) the Government will be free from its obligations under this Agreement; (ii) the Government may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, the Government will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that the Government is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

18.    The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

19.    This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between the Government and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and the

7

Government other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Kelly O. Hayes
United States Attorney

_____
Christina A. Hoffman
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_6/2/26_____          _____
Date                    Rodney Burton

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

_6/2/26_____          _____
Date                    Shari Silver Derrow, Esq.

8

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

### Relevant Entities, Individuals, and Terms

HyperFund, a/k/a "HyperTech," a/k/a "HyperCapital," a/k/a "HyperVerse," a/k/a "HyperNation" (collectively, "HyperFund") was an unincorporated organization established in approximately June 2020. HyperFund operated a purportedly legitimate decentralized finance, or "DeFi," crypto asset investment platform, and touted its investment program to the public through social media and other means. In truth, HyperFund was a global wire fraud scheme that obtained approximately $1.89 billion from victim-investors world-wide.[1]

HyperFund conducted its business principally by means of websites, including http://thehyperfund.online, https://thehyperfund.com/, https://h5.thehyperverse.net/, and https://www.thehyperverse.net/ (collectively, the "HyperFund Websites"). The HyperFund Websites were accessible worldwide to the public, including to prospective investors residing within the District of Maryland.

Defendant Rodney **BURTON**, a/k/a "Bitcoin Rodney," was a resident of Miami-Dade County, Florida, in the Southern District of Florida.

Brenda Chunga, a/k/a "Bitcoin Beautee," was a resident of Anne Arundel County, Maryland.

"Cryptocurrency" is a digital asset in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than a centralized authority such as a bank or government. Like traditional fiat currency, there were multiple types of cryptocurrencies, such as Bitcoin (BTC) and Tether (USDT).

A blockchain or distributed ledger was a database spread across a network of computers that recorded transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." These systems typically relied in cryptographic techniques to secure recording of transactions.

Decentralized Finance, or "DeFi," generally referred to various financial applications, or technology, in blockchain and cryptocurrency that sought to remove centralized institutions, third parties and other intermediaries from financial transactions.

---

[1] The parties do not agree whether and to what extent these losses were attributable to the Defendant's conduct and reasonably foreseeable to him

9

Title 31 of the United States Code, Section 5330, and the regulations promulgated thereunder, set forth money transmitting business registration requirements under federal law. Transactions denominated in whole or in part in cryptocurrencies were subject to these requirements and required registration with the Secretary of the Treasury. Failure to register could result in a civil penalty.

Maryland Code, Financial Institutions, § 12-405(a) requires a license to engage in the business of money transmission. Section 12-430 makes it a felony for any person to knowingly and willfully violate that requirement.

## HyperFund

In approximately June 2020, HyperFund was founded. A network of HyperFund promoters, in the District of Maryland and elsewhere, made fraudulent promotional presentations to investors and potential investors. In those presentations, promoters touted HyperFund investment programs, including the purported returns that prospective investors could earn from investing with HyperFund. Potential investors were told that they could purchase "memberships" in the "world's most sustainable passive rewards program."

HyperFund promoters falsely claimed that investors who purchase "memberships" would receive between 0.5% and 1% daily in passive rewards until HyperFund doubled or tripled the investors' initial investment. To convince investors that HyperFund could make these daily payments of passive rewards, HyperFund promoters claimed that payments would be disbursed in part from revenues generated from large-scale crypto mining operations. In fact, HyperFund did not have any such operations.

HyperFund rewards took the form of "HU," a/k/a "hyper units," a/k/a/ "HyperUSD," a trading currency internal to HyperFund. HyperFund claimed that HU had parity with the U.S. dollar. HyperFund's investors typically acquired HU by converting fiat currency to the cryptocurrency Tether via a digital exchange, transferring that Tether to HyperFund's platform, and finally exchanging that Tether for HU.

Initially, investors who sought to withdraw their funds were able to convert HU to Tether through HyperFund's platform and convert that cryptocurrency to fiat currency. However, beginning in or around July 2021, HyperFund began blocking investors' ability to withdraw HU and convert it to other cryptocurrency (that could in turn be converted to fiat currency). After HyperFund began blocking withdrawals, HyperFund investors could not convert their HU to cryptocurrency but they could transfer HU to other investors' HyperFund accounts. In or around March 2022, the HyperFund scheme collapsed and investors were no longer able to make withdrawals.

## BURTON's Activities

BURTON conspired with others, including Brenda Chunga, to provide unlicensed money transmitting services, for the purpose of promoting HyperFund, obtaining, converting, and using investors' funds, and enhancing their own personal wealth. It was part of the conspiracy that

**BURTON** knowingly conducted, controlled, managed, supervised, directed, and owned three entities, Burton Holdings Co. LLC; RBJ Consulting, Inc.; and The Bit Group, LLC (together, the "Burton Entities"). The Burton Entities purportedly offered consulting services but were in fact, unlicensed money transmitting businesses. **BURTON** never registered any of the Burton Entities as a money transmitting business. The Burton Entities were all located at the same address: 137 National Plaza, Suite 300, Oxon Hill, Maryland.

For example, on July 9, 2021, a co-conspirator texted **BURTON**, "Can you take 100k cash deposit and get my HU or USDT." On the same day, **BURTON** responded, "Yep," and sent his Citibank account and routing numbers for an RBJ Consulting, Inc. account, adding, "All transactions must say memo… consulting/Training," as well as his TD Bank account for Burton Holdings Co., adding "memo… CONSULTING." **BURTON** often took a three percent fee for exchanging currencies. For example, on August 12, 2021, after Brenda Chunga sent him a text, "Can you please check to see if the 30k hit your account today for [Victim-Investor]," **BURTON's** bank account received a corresponding wire of $30,900—of which the $900 was the three percent currency exchange fee—from the Victim-Investor.

**BURTON** directed HyperFund investors to transfer to him U.S. dollars via wire or check to **BURTON's** personal bank accounts and/or bank accounts for the Burton Entities. **BURTON** then transferred a purportedly equivalent amount of Tether cryptocurrency and/or HU from his HyperFund account to investors' HyperFund accounts, often in exchange for a three percent fee. **BURTON** instructed co-conspirators and investors to send U.S. dollars via wire or check with the memo line indicating that the payments were for consulting or training services. In fact, no such services were provided.

In furtherance of the conspiracy and to effect its objects, **BURTON** and his co-conspirators committed the following overt acts:

a. On March 2, 2021, **BURTON** received a $40,000 wire transfer to Burton Holdings Co. LLC from Victim-Investor 1, a then-resident of Montgomery Village, Maryland. The memo line stated, "Membership Registration."

b. On March 17, 2021, **BURTON** received an additional $10,000 wire transfer to The Bit Group, LLC, from Victim-Investor 1.

c. On April 9, 2021, **BURTON** received $20,500 to Burton Holdings Co. LLC in the form of a cashier's check from Victim-Investor 1's wife, Victim-Investor 2. The memo line stated, "Consulting Fund hypercyn account." Victim-Investor 2 was also a then-resident of Montgomery Village, Maryland.

d. In or about March and April 2021, **BURTON** transferred a purportedly equivalent amount of Tether from his own HyperFund account to Victim-Investor 1 and Victim-Investor 2's HyperFund account.

e. On or about June 26, 2021, **BURTON** provided wire information for Burton Holdings Co. LLC, which could be used in facilitating a money transfer to himself.

11

BURTON directed that the memo line for the transfer should falsely state that the transfer was for "CONSULTING" when in fact no such services were rendered.

f.  From June 2020 through January 2022, BURTON received 562 transfers from HyperFund investors and others, including individuals in the District of Maryland. These transfers totaled $7,851,711.00 in U.S. currency. These transfers affected interstate commerce and resulted in interstate wire communications.

BURTON personally received at least $7,851,711.00 in U.S. currency in proceeds from the operation of the unlicensed money transmitting business.

### Facts Related to BURTON's 2025 Acceptance of Responsibility

On August 5, 2025, the Government extended its first plea offer to BURTON. BURTON met with his prior counsel, Kobie Flowers, on multiple occasions to discuss the first plea offer. On September 12, 2025, Mr. Flowers wrote to Government counsel with the header "Conditional Acceptance of Plea Offer" and stated that BURTON would accept the plea offer if certain changes were made.

On September 17, 2025, the Government sent a revised plea offer, which made most of the requested changes. The revised offer was set to expire on September 19, 2025, but the Government later agreed to extend the deadline to September 26, 2025.

On September 26, 2025, BURTON met with Mr. Flowers. At that meeting, BURTON accepted the revised plea offer, and both BURTON and Mr. Flowers signed it. However, on the evening of September 26, 2025, Mr. Flowers emailed Government counsel, writing, "we are not prepared to accept the plea offer at this time." Government counsel responded that the Government would be moving forward with the case in light of Mr. Flowers' representation that BURTON rejected the plea offer.

Mr. Flowers did not meet with BURTON again until December 1, 2025. On December 1, 2025, BURTON asked Mr. Flowers about the status of his plea agreement, and Mr. Flowers told BURTON that the plea offer was no longer available. BURTON asked if Mr. Flowers could get the plea offer back, and Mr. Flowers told him no. On December 10, 2025, the Government obtained a Superseding Indictment adding multiple charges for conspiracy to commit wire fraud, wire fraud, and money laundering. ECF 69.

On February 12, 2026, an attorney inquiry hearing was held. At the hearing, Government counsel reviewed the procedural history of the case, including the two plea offers it had extended. The Court asked BURTON whether he had rejected each of the plea offers extended to him. BURTON stated he "rejected the first one; not the second one," and that he "signed the second one." Later, BURTON told the Court, "Mr. Flowers may have rejected [the second plea], but I accepted it," and that "I signed the plea and he also signed the plea. So I accepted the actual plea." Mr. Flowers acknowledged that he and BURTON signed the revised plea offer on September 26, 2025, but claimed this was done to "spare" Mr. Flowers another trip to the pretrial detention facility, and that Mr. Flowers and BURTON were still trying to get "a concession from the Government." However, Mr. Flowers never asked the Government for further concessions; he

simply told the Government, incorrectly, that **BURTON** had rejected the plea offer. The Government did not learn until after the attorney inquiry hearing that **BURTON** had signed and accepted the revised plea offer dated September 17, 2025.

I have read this Statement of Facts and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. I do not wish to change any part of it.

I agree that this plea offer contains the same material terms as the offer dated September 17, 2025, which was admitted as Government's Exhibit 2 at the attorney inquiry hearing. I have thoroughly discussed with my current counsel the possible bases for a claim of ineffective assistance of my prior counsel. In consultation with my current counsel, and in exchange for the concessions made by the Government in this Agreement, I have elected not to pursue such a claim and to plead guilty instead.

_6/2/26_
Date

_____
Rodney Burton

I am Rodney Burton's attorney. I have carefully reviewed every part of this Statement of Facts with him. To my knowledge, his decision to sign it is an informed and voluntary one.

_6/2/26_
Date

_____
Shari Silver Derrow, Esq.